**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X

SECURITIES INVESTOR PROTECTION
CORPORATION,

                Plaintiff,

      v.

BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

                Defendant.

----------------------------------------------------------------X

In re:

BERNARD L. MADOFF,

                Debtor.

----------------------------------------------------------------X

IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff
Investment Securities LLC,

                Plaintiff,

      v.

RICHARD I. STAHL, *et al.*,[1]

                Defendants.

----------------------------------------------------------------X

**FOR PUBLICATION**

Adv. Pro. No. 08-01789 (BRL)

SIPA LIQUIDATION

(Substantively Consolidated)

Adv. Pro. No. 10-03268 (BRL)

APPEARANCES:

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone:    (212) 589-4200
Facsimile:    (212) 589-4201
<u>By</u>:    David J. Sheehan
        Marc E. Hirschfield
        Deborah H. Renner
        Tracy L. Cole

---

[1] Two of the third party plaintiffs voluntarily agreed to the injunction requested in the instant motion. Accordingly, the trustee has withdrawn without prejudice his application with respect to Matias Erausquin, Enrique Erausquin, Liliana Controne and Yolanda Frischknecht, *see* Stipulation of Dismissal and Amendment of Caption (Dkt. No. 34), and Neville Seymour Davis, on behalf of himself and those he purports to represent, *see* Stipulation of Stay Dismissal and Amendment of Caption (Dkt. No. 36), who were all originally defendants in this action. The complete caption, as amended, is attached hereto as Exhibit A.

Keith R. Murphy
Amy Vanderwal
Sammi Malek
Ferve Ozturk
*Attorneys for Irving H. Picard, Esq., Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

PAVIA & HARCOURT LLP
600 Madison Avenue, 12th Floor
New York, NY 10022-1653
Telephone:    (212) 980-3500
Facsimile:    (212) 980-3185
By:    Adam D. Mitzner
        Jonathan A. Selva
*Attorneys for Reed Abend and Richard I. Stahl*

COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:    (650) 697-6000
Facsimile:    (650) 697-0577
By:    Steven N. Williams
        -- and --
One Liberty Plaza, 23rd Floor
New York, NY 10006
Telephone:    (212) 682-3198
Facsimile:    (646) 219-6678
By:    Imtiaz A. Siddiqui
*Attorneys for Jay Wexler, Daniel Ryan, Theresa Ryan, Matthew Greenberg, Walter Greenberg, Doris Greenberg, The Estate of Leon Greenberg, and Donna M. McBride*

GIBBONS P.C.
One Pennsylvania Plaza, 37th Floor
New York, NY 10119-3701
Telephone:    (212) 613-2000
Facsimile:    (212) 290-2018
        -- and --
One Gateway Center
Newark, NJ 07102
Telephone:    (973) 596-4500
Facsimile:    (973) 596-0545
By:    Dale E. Barney
        Michael R. Griffinger
        Jennifer A. Hradil
        Jonathan S. Liss
*Attorneys for The Lautenberg Foundation, Joshua S. Lautenberg and Ellen Lautenberg*

PULLMAN & COMLEY, LLC
850 Main Street, P.O. Box 70006
Bridgeport, CT 06601-7006
Telephone:     (203) 330-2000
Facsimile:     (203) 576-8888
<u>By</u>:     Elizabeth J. Austin
          Irve J. Goldman
          Richard C. Robinson

SILVER GOLUB & TEITELL, LP
184 Atlantic Street, P.O. Box 389
Stamford, CT 06904
Telephone:     (203) 325-4491
Facsimile:     (203) 325-3769
<u>By</u>:     David S. Golub
          Jonathan M. Levine
*Attorneys for The Retirement Program for the Employees of the Town of Fairfield, The
Retirement Program for the Police Officers and Firemen of the Town of Fairfield, and The Town
of Fairfield*


Before: Hon. Burton R. Lifland
          United States Bankruptcy Judge


### MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION FOR ENFORCEMENT OF THE AUTOMATIC STAY AND FOR A PRELIMINARY <u>INJUNCTION</u>

Before the Court is the motion (the "Motion")[2] of Irving H. Picard, Esq. ("Trustee"),

trustee for the substantively consolidated Securities Investor Protection Act[3] ("SIPA")

liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff

("Madoff"), seeking an order pursuant to, *inter alia*, sections 362(a) and 105(a) of the

Bankruptcy Code (the "Code") and Rule 7065 of the Federal Rules of Bankruptcy Procedure

("Bankruptcy Rules") (i) enforcing the automatic stay and the December 15, 2008 stay order and

---

[2] On May 27, 2010, the Trustee commenced the above-referenced adversary proceeding by filing a complaint against the third party plaintiffs.  That same day, the Trustee filed the Motion. An Order to Show Cause was entered on May 28, 2010 establishing a briefing schedule and scheduling a hearing to consider the Motion, which was ultimately adjourned on consent of the parties to February 9, 2011.

[3] 15 U.S.C. §§ 78aaa *et seq.*  References to sections of SIPA hereinafter shall replace "15 U.S.C." with "SIPA."

related orders (the "Stay Orders") of the United States District Court for the Southern District of

New York (the "District Court") and declaring the actions (the "Third Party Actions") brought in

various jurisdictions by the above-named defendants (the "Third Party Plaintiffs") against Ruth

Madoff, Peter Madoff, Andrew Madoff, Mark Madoff[4] and Shana Madoff (collectively, the

"Madoff Defendants") void *ab initio* as against the Madoff Defendants; and (ii) enjoining the

Third Party Plaintiffs from litigating the Third Party Actions, or any related actions, against the

Madoff Defendants pending completion of the Trustee's actions against the Madoff Defendants

(the "Trustee's Madoff Actions").  Certain, but not all, of the Third Party Plaintiffs have filed

briefs in opposition to the Motion.[5]

For the reasons set forth below and at oral argument, the Motion is hereby GRANTED.

### BACKGROUND

The facts underlying Madoff's notorious Ponzi scheme and this SIPA liquidation are now

well known and are comprehensively outlined in prior decisions of this Court, including the

March 1, 2010 net equity decision (the "Net Equity Decision").  *See Sec. Investor Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC)*, 424 B.R. 122, 125–33

(Bankr. S.D.N.Y. 2010).

### I.    The SIPA Trustee's Authority and the Claims Administration Process

In addition to the powers granted by SIPA, the Trustee has the general powers and duties

of a bankruptcy trustee.  *See* SIPA § 78fff-1(a), (b).  He is charged with assessing claims,

recovering and distributing customer property to BLMIS customers and liquidating the assets of

---

[4] Mark Madoff is recently deceased.  *Picard v. Peter B. Madoff, et al.*, Adv. Pro. No. 09-1503, Statement Noting Death of Defendant Mark D. Madoff (Dkt. No. 46).

[5] Defendants FLB Foundation, LTD and Emilio Chavez, Jr. have not opposed the Motion.  FLB Foundation, LTD filed an Answer in response to the Trustee's complaint on June 24, 2010.  (Dkt. No. 12).  As this Court's decision applies to all of the Third Party Plaintiffs, it also applies to FLB Foundation, LTD and Emilio Chavez, Jr.

BLMIS for the benefit of the estate and its creditors.  On December 23, 2008, the Court entered

an Order Approving Form and Manner of Publication and Mailing of Notices; Specifying

Procedures For Filing, Determination, and Adjudication of Claims; and Providing Other Relief

(the "Claims Procedure Order"), setting forth a systematic framework for the filing,

determination and adjudication of claims in accordance with SIPA.  Pursuant to the Claims

Procedure Order, all customer claims are filed with the Trustee, who must determine the claims

in writing.  If the claimant does not object to the determination, it is deemed approved by the

Court and binding on the claimant.  If the claimant objects and files an opposition, the Trustee

must obtain a hearing date and notify the claimant thereof.  *See Peskin v. Picard (In re Bernard

L. Madoff Inv. Sec. LLC)*, 413 B.R. 137 (Bankr. S.D.N.Y. 2009), *aff'd*, 440 B.R. 579 (S.D.N.Y.

2010) (expounding generally on the claims administration process).  These claims are then

satisfied in accordance with the provisions of SIPA.

## II.    The Satisfaction of Customer Claims in a SIPA Liquidation

The statutory framework for the satisfaction of customer claims in a SIPA liquidation

proceeding provides that customers share *pro rata* in customer property[6] to the extent of their net

equities, as defined in SIPA section 78*lll*(11) ("Net Equity").  *See* SIPA § 78fff-2(c)(1)(B).  If

the fund of customer property is insufficient to make customers whole, the trustee is entitled to

an advance from SIPC to pay each customer the amount by which his Net Equity exceeds his

ratable share of customer property, subject to a cap of $500,000 for securities claims.  *See* SIPA

§ 78fff-3(a).

On March 1, 2010, after briefing and oral argument, the Court issued its Net Equity

Decision approving the Trustee's method of calculating a customer's Net Equity as the amount

---

[6] A fund of "customer property" consists of assets garnered by the SIPA trustee on account of customers.  These
assets are not ascribable to individual customers, but rather are distributed *pro rata* to the extent of a customer's Net
Equity.  *See* SIPA § 78*lll*(4) (defining "customer property").

of cash deposited into the customer's BLMIS account, less any amounts withdrawn from the customer's BLMIS account. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 135, 140 (Bankr. S.D.N.Y. 2010). The Court entered an order implementing its Net Equity Decision on March 8, 2010 (the "Net Equity Order"). The Net Equity Decision and Order, in accordance with SIPA and controlling Second Circuit precedent, upheld the Trustee's determination to allow claims in the amount of customers' net investments, denying claims of those customers whose withdrawals exceeded their initial investments and subsequent deposits. The Court's Net Equity Decision and Order held that the fictitious profits listed on customers' last BLMIS account statements as of the Filing Date were not controlling for purposes of determining customers' Net Equity claims.

On March 16, 2010, the Court, on its own motion, joined by the requests of certain parties, certified its Net Equity Order for immediate appeal to the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. section 158(d)(2). *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 08-01789 (BRL), Dkt. No. 2022. Oral argument before the Second Circuit on the Net Equity issue has been scheduled for March 3, 2011.

### III.    The Trustee's Madoff Actions

The Trustee has filed two separate actions against the Madoff Defendants seeking to avoid and recover preferential payments and fraudulent transfers totaling over $244 million for distribution to victims in accordance with SIPA. The first complaint proceeds against Ruth Madoff, and the second against the remaining Madoff Defendants—Peter Madoff, Andrew Madoff, Mark Madoff and Shana Madoff.

In both actions, the Trustee has alleged that the Madoff Defendants were intimately

6

associated with the Ponzi scheme by virtue of their familial ties to Madoff himself and their positions of authority in BLMIS and its related entities.   Ruth, Peter, Andrew, Mark, and Shana Madoff are Madoff's wife, brother, sons, and niece, respectively.   In addition, Ruth Madoff was a controller at Madoff Securities International Ltd. ("MSIL"), a British affiliated entity of BLMIS, in which she held a financial interest.   In that capacity she had responsibilities for account reconciliation within the fraudulent investment advisory ("IA") business.   *See Picard v. Ruth Madoff*, Adv. Pro. No. 09-1391, Dkt. No. 1, ¶ 6.   Peter Madoff was BLMIS's Senior Managing Director and Chief Compliance Officer, Mark and Andrew Madoff were Co-Directors of Trading, and Shana Madoff at times held herself out as Compliance Counsel, in-house Counsel and Compliance Director of BLMIS.   Further, Mark Madoff "at times, managed both the Firm's proprietary trading desk and its market-making operations," and Andrew Madoff "supervised trading at the Company, managed the trading floor, and directed many audit and compliance projects for the Company, including the confirmation and reporting of trades."   *See Picard v. Madoff, et al.*, Adv. Pro. No. 09-1503, Dkt. No. 1, ¶¶ 7-8.

**Picard v. Ruth Madoff, Adv. Pro. No. 09-1391 (BRL)**

The Trustee filed his complaint against Ruth Madoff (the "Ruth Madoff Complaint") on July 29, 2009, seeking the return of over $44 million pursuant to SIPA sections 78fff(b), 78fff-1(a), and 78fff-2(c)(3), sections 105(a), 502(d), 541, 542, 544, 548(a), 550(a), and 551 of the Code, the New York Fraudulent Conveyance Act and New York common law.   The common law claims sound in conversion and unjust enrichment, and the Trustee seeks the imposition of a constructive trust, an accounting, and compensatory and punitive damages.[7]   The Ruth Madoff

---

[7] The Trustee and Ruth Madoff entered into a so-ordered stipulation on January 26, 2011 extending her time to move, answer or otherwise respond to the Complaint up to and including March 31, 2011, and adjourning the pretrial conference, originally scheduled for February 8, 2011, to April 27, 2011.  Adv. Pro. No. 09-1391 (Dkt No. 18).

Complaint alleges, *inter alia*, that Ruth Madoff, in her capacity as controller at MSIL, received tens of millions of dollars from BLMIS for no legitimate business purpose, without corresponding benefit to BLMIS, and to which she had no good faith basis to believe she was entitled.

***Picard v. Madoff, et al., Adv. Pro. No. 09-1503 (BRL)***

On October 2, 2009, the Trustee filed his complaint against Peter, Andrew, Mark and Shana Madoff (the "Madoff Family Complaint," and together with the Ruth Madoff Complaint, the "Trustee's Madoff Complaints") alleging that as senior executives of BLMIS, they were derelict in their duties to protect BLMIS and its customers from acts of mismanagement, and they disregarded their regulatory and compliance duties for their own respective profit, to the detriment of BLMIS and its customers. Specifically, Peter and Shana Madoff failed to perform their duties to "monitor[] BLMIS's operation and ensur[e] its compliance with federal securities laws and regulations and corresponding FINRA rules and regulations." Madoff Family Complaint, ¶¶ 37, 43, 44. Moreover, the Trustee alleges that Mark and Andrew Madoff either knew or should have known that grave securities laws violations were occurring under their supervision and control at BLMIS and MSIL, and that they either purposefully ignored or failed to detect and stop these violations. *See id.*, ¶¶ 47-49. In the process, each was compensated in excessive amounts from BLMIS. *Id.*, ¶¶ 28, 59-64. The Madoff Family Complaint seeks the return of nearly $200 million pursuant to the above-referenced sections of SIPA, the Code, the New York Fraudulent Conveyance Act and New York common law. The Trustee also seeks punitive and compensatory damages for unjust enrichment, negligence, breach of fiduciary duty,

and conversion, and seeks the imposition of a constructive trust and an accounting.[8] *Id.*, ¶¶ 176-214.

### IV.   The Third Party Actions

Subsequent to the commencement of this SIPA liquidation, the Third Party Plaintiffs filed their Third Party Actions against the Madoff Defendants, as well as other defendants,[9] for alleged injuries arising from the Ponzi scheme.   There are ten such actions pending that the Trustee currently seeks to enjoin as against the Madoff Defendants.   Four of these actions remain active, and six have been temporarily stayed.

### a.   Currently Active Third Party Actions

There are four Third Party Actions that are currently active: (i) *The Lautenberg Foundation v. Madoff*, Case No. 09-CV-00816 (D.N.J.); (ii) *Stahl v. Madoff*, Index No. 601862/2009 (Sup. Ct. N.Y. Co.); (iii) *Abend v. Madoff*, Index No. 601861/2009 (Sup. Ct. N.Y. Co.); and (iv) *Chavez v. Picard*, Case No. 09-MC-0006 (N.D. Tex.).

**The Lautenberg Foundation v. Madoff, Case No. 09-CV-00816 (D.N.J. 2009)**

On February 24, 2009, the Lautenberg Foundation, Joshua S. Lautenberg and Ellen Lautenberg (collectively, the "Lautenberg Plaintiffs") filed a complaint against Peter Madoff in the District Court for the District of New Jersey alleging, *inter alia*, violations of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78, Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, breach of fiduciary duty, negligent misrepresentation, negligence, and aiding and abetting breach of fiduciary duty (the "Lautenberg

---

[8] Peter, Mark, Andrew and Shana Madoff moved to dismiss the Trustee's complaint against them, which the Trustee has opposed.   A hearing on these motions was held before the Court.   Among the plethora of Madoff-related motions that have been determined before this Court, this motion is currently pending.

[9] Three of the Third Party Actions proceed against only the Madoff Defendants: *The Lautenberg Foundation v. Madoff*, Case No. 09-CV-00816 (D.N.J.); *Stahl v. Madoff*, Index No. 601862/2009 (Sup. Ct. N.Y. Co.), and *Abend v. Madoff*, Index No. 601861/2009 (Sup. Ct. N.Y. Co.).

Action").    *See* Affidavit of David J. Sheehan In Support of Trustee's Application for

Enforcement of Automatic Stay and Preliminary Injunction ("Sheehan Aff.") (Dkt. Nos. 6-7),

Ex. A [hereinafter, "Lautenberg Compl."], ¶¶ 35-62.    The complaint seeks compensatory,

consequential, and punitive damages, in addition to attorneys' fees and other expenses and

interest. *Id.*, pp. 22-23.

      The Lautenberg Plaintiffs allege that they suffered these losses as a result of their

investment of $8,992,000 with BLMIS "in reliance on the purported superior knowledge,

training, skill, honesty, ethics, and integrity of BMIS, its members, officers, directors and

employees . . . ." *Id.*, ¶¶ 16-23.    They allege that Peter Madoff knew or should have known of

the Ponzi scheme, ignored obvious "red flags" and acquiesced in BLMIS's false representations.

      On September 9, 2009, the New Jersey District Court dismissed without prejudice the

Lautenberg Plaintiffs' claims for negligent misrepresentation and violations of Section 10(b) of

the Exchange Act insofar as they were based on affirmative misrepresentations.    *See* Sheehan

Aff., Ex. B.    The Lautenberg Plaintiffs' claims based on omissions of material facts, however,

survived the motion to dismiss.    *See id.*, pp. 34-35.

      On March 12, 2010, the Lautenberg Plaintiffs filed a motion for summary judgment (the

"Summary Judgment Motion"). *Id.*, Ex. C.    On April 27, 2010, Peter Madoff filed an opposition

to the Summary Judgment Motion and a cross motion to stay the litigation for nine months due

to, *inter alia*, the pending United States Attorney's criminal investigation and difficulties in

preparing a defense due to a lack of access to evidence (the "Cross Motion"). *Id.*, Ex. D, pp. 50-

58.    On May 20, 2010, the Lautenberg Plaintiffs filed their reply to Peter Madoff's Opposition to

their Summary Judgment Motion and opposed Peter Madoff's Cross-Motion.    *Id.*, Ex. E.    The

parties are currently scheduled to appear for a status conference before the New Jersey District

Court on February 9, 2011.  Letter to Judge Lifland dated January 20, 2011 providing an update of the various related actions, p. 2 (Dkt. No. 35) [hereinafter, "Status Letter"].

**Stahl v. Madoff, Index No. 601862/2009 (Sup. Ct. N.Y. Co.); Abend v. Madoff, Index No. 601861/2009 (Sup. Ct. N.Y. Co.)**

On June 16, 2009, Stahl and Abend, represented by the same law firm, filed separate actions in the Supreme Court of the State of New York against Mark and Andrew Madoff (the "Stahl Action" and the "Abend Action"), seeking the recovery of deferred compensation and back pay.  Stahl and Abend set forth causes of action for fraud, fraudulent omission and failure to pay wages under New York law.  Sheehan Aff., Ex. G [hereinafter, "Abend Compl."], ¶¶ 30-46; *Id.*, Ex. H [hereinafter, "Stahl Compl."], ¶¶ 31-47.  They essentially allege that Mark and Andrew Madoff knew or should have known about their father's Ponzi scheme, but never informed BLMIS's employees, or misrepresented the legitimacy of the IA business to BLMIS employees, including Stahl and Abend.[10]  They did so in order to "perpetuate their father's lawless conduct" and induce the employees to continue to work for the "legitimate" arm of BLMIS.  Stahl Compl., ¶¶ 7, 22-24; Abend Compl., ¶¶ 7, 21-23.  In addition to other relief, Stahl seeks approximately $1.3 million in compensatory damages, and Abend seeks approximately $475,000 in compensatory damages.  Abend Compl., ¶¶ 25, 35, 40, pp. 8-9; Stahl Compl., ¶¶ 26, 36, 41, p. 9.  These plaintiffs are seeking damages in their state court actions in the exact dollar amounts specified in their creditor claims filed with the Trustee.  Abend Compl., ¶¶ 25, 35, 40, pp. 8-9; Stahl Compl., ¶¶ 26, 36, 41, p. 9.

On July 27, 2009, Mark and Andrew Madoff filed motions to dismiss the Stahl and

---

[10] For example, Stahl and Abend contend that, in connection with the May 2001 *Barron's* article entitled "Don't Ask, Don't Tell," wherein the author questioned Madoff's consistent returns, "the Madoff Sons told the employees of the Trading Business—including Plaintiff—that the suspicions raised by the article were not true. The Madoff Sons went on to state falsely that Madoff's investment advisory business was completely legitimate."  Abend Compl., ¶¶ 22, 23; Stahl Compl., ¶¶ 21, 22.

Abend complaints for failure to state a cause of action. Sheehan Aff., Ex. J. On March 9, 2010, the New York Supreme Court partially granted the motion: it dismissed Stahl's and Abend's claims for failure to pay wages under New York Labor Law § 190 *et seq.* but allowed the remaining claims to proceed. *Id.*, Ex. K. Both sides have appealed this decision. *Id.*, Exs. L, M. In addition, discovery has commenced in both cases. Depositions have been scheduled and document requests have been sent to the Trustee. *Id.*, Ex. O. After Stahl and Abend sought to compel Andrew Madoff's testimony, the court ordered that depositions be taken the week of February 21, 2011 and discovery be completed by April 1, 2011. Letter to Judge Lifland dated February 9, 2011 providing a supplemental update of the various related actions, pp. 1–2 (Dkt. No. 48) [hereinafter, "Second Status Letter"].

### *Chavez v. Picard*, Case No. 09-MC-00006 (N.D. Tex.)

Emilio Chavez, Jr. ("Chavez") is currently an inmate at a Texas correctional facility. Although Chavez claims to have "opened several accounts," the Trustee maintains that he never held a BLMIS customer account. Sheehan Aff., Ex. U [hereinafter, "Chavez Compl."], p. 6. On or about March 5, 2009, Chavez commenced an action in the United States District Court for the Northern District of Texas on behalf of fourteen entities, all with an address at 2302 36th Street, Lubbock, Texas.[11] The complaint proceeds against the Madoff Defendants, Robert Jaffe, Cohmad Securities, Fairfield Greenwich Group, and others and alleges a litany of claims, including breach of implied contract and fiduciary duties, fraud, misrepresentation, deceptive trade practice, misappropriation of funds, theft, mismanagement, and violations of section 12 of the Securities Act of 1933, 15 U.S.C. § 77, 78(b), section 10(b) of the Exchange Act, 17 C.F.R. §

---

[11] These entities are Chavez Holding LLC; Chavez Transportation; Chavez Foundation; Chavez Family Trust; West Texas Outreach, Inc.; West Texas Human Resource Corp.; Jenny Holding, LLC; The Jenny Group, AG; Jenny Global, Ltd.; Jenny Financial Group, AG; Jen Tech, AG; Chavez Capital Holding, LLC; Christian Family Outreach, Inc.; and Chavez Estate. Chavez Compl., pp. 2-3.

240.10b-5, the Hobbs Act and the Racketeer Influenced Corrupt Organizations Act. Chavez characterizes the complaint as "a securities fraud action against defendants group for maintaining a Ponzi scheme" as a result of which "more than $750 million dollars was diverted from the true purchase of securities into a criminal enterprise" causing him losses and damages in excess of $750 million. Chavez Compl., pp. 6-7.

### b.  Currently Stayed Third Party Actions

Six of the third-party actions the Trustee seeks to enjoin are currently temporarily stayed: (i) *Retirement Program for Employees of the Town of Fairfield v. Bernard L. Madoff, et al.*, Case No. 09-CV-5011561 (S) (Conn. Super. Ct.); (ii) *Wexler v. KPMG, LLP*, Index No. 101615/2009 (Sup. Ct. N.Y. Co.); (iii) *Ryan v. Friehling & Horowitz, P.C.*, Index No. 101616/2009 (Sup. Ct. N.Y. Co.); (iv) *Greenberg v. Friehling & Horowitz, P.C.*, Index No. 650633/2009 (Sup. Ct. N.Y. Co.); (v) *McBride v. KPMG International*, Index No. 650632/2009 (Sup. Ct. N.Y. Co.); and (vi) *FLB Foundation, Ltd. v. Bernard L. Madoff Inv. Sec. LLC*, Index No. 101615/2009 (N.Y. Sup. Ct.).[12]

***Retirement Program for Employees of the Town of Fairfield v. Bernard L. Madoff, et al.*, Case No. 09-CV-5011561 (S) (Conn. Super. Ct).**

The Retirement Program for Employees of the Town of Fairfield, the Retirement Program for Police Officers and Firemen of the Town of Fairfield (together with The Retirement Program for Employees of the Town of Fairfield, the "Retirement Programs"), and the Town of Fairfield (collectively, the "Fairfield Plaintiffs") commenced an action (the "Fairfield Action") pending before the Superior Court of Connecticut against Madoff, the Madoff Defendants, and various other entities, alleging *inter alia*, receipt of fraudulent transfers, statutory theft, aiding

---

[12] To the extent these actions proceeded against Madoff, BLMIS, Madoff International and Madoff, Ltd., they were automatically stayed upon the commencement of the SIPA proceeding. *See* 11 U.S.C. § 362(a)(1), (3); 15 U.S.C. § 78fff(b) (applying chapter 3 of Title 11).

and abetting theft, and unjust enrichment.  Sheehan Aff., Ex. V [hereinafter, "Fairfield Compl."].

Specifically, they allege that Peter Madoff "either knew or willfully refused to know that

[Madoff] and the Feeder Fund Defendants were operating an illegal investment services

operation," "intentionally utilized his management authority at BLMIS . . . to help further

defendants' criminal scheme," and "intentionally assist[ed]" Madoff to perpetuate the scheme,

and that the other named Madoff Defendants received fraudulent transfers from Madoff and

BLMIS.  Fairfield Compl., 1st Count, ¶¶ 73-74; 18th Count, 90-97; 19th Count, 87-91, 20th Count,

21st Count.   As against the Madoff Defendants, the Fairfield Plaintiffs seek avoidance of

fraudulent and preferential transfers, and the imposition of a constructive trust over "the illicit

proceeds and assets" received.  In addition to compensatory and punitive damages, they seek

statutory damages and attorneys' fees.  *Id.*, p. 69.

In defense of the Fairfield Action, the Madoff Defendants filed motions to dismiss, and

the claims against Ruth Madoff were withdrawn in July 2009.  The motions to dismiss were

granted as to the other Madoff Defendants in a memorandum decision on April 16, 2010.

Sheehan Aff., Ex. X (Dec. on Defs' Mots. to Dismiss (#s 145; 148; 162; 164 & 168), *Retirement

Program for the Employees of the Town of Fairfield, et al. v. Bernard L. Madoff, et al.*, 09-CV-

5011561 (S) (Conn. Super. Ct. 2010)) [hereinafter, *Fairfield Motion to Dismiss Decision*].  The

court held that the Fairfield Plaintiffs lacked standing under Connecticut law to assert their

claims against the Madoff Defendants in that they "ha[d] not asserted a 'separate and distinct'

harm" from that suffered by Maxam Absolute Return Fund, L.P. ("Maxam Fund"), the feeder

fund that invested their money with BLMIS, and their claims were thus derivative and

commenced without proper authorization.  *Id.*, pp. 21–28 ("[A]s to the claims against . . . Peter

Madoff, Andrew Madoff and Mark Madoff, the harms claimed by the plaintiffs in those counts

10-03268-smb    Doc 49    Filed 02/09/11    Entered 02/09/11 16:58:32    Main Document
Pg 15 of 37

are indirect, remote and derivative with respect to those defendants' conduct.  Therefore, the plaintiffs lack standing to assert them.").  The Fairfield Plaintiffs appealed this decision on May 3, 2010, which is currently pending.  The Fairfield Plaintiffs also filed an amended complaint on November 1, 2010.  Fairfield Mem., (Dkt. No. 24),[13] Ex. B [hereinafter, "Fairfield Amended Compl."], and the Madoff Defendants filed petitions to remove the action to the District Court for the District of Connecticut.  Status Letter, p. 2.

*(i) Wexler v. KPMG, LLP, Index No. 101615/2009 (Sup. Ct. N.Y. Co.); (ii) Ryan v. Friehling & Horowitz, P.C., Index No. 101616/2009 (Sup. Ct. N.Y. Co.); (iii) Greenberg v. Friehling & Horowitz, P.C., Index No. 650633/2009 (Sup. Ct. N.Y. Co.); (iv) McBride v. KPMG International, Index No. 650632/2009 (Sup. Ct. N.Y. Co.); (v) FLB Foundation, Ltd. v. BLMIS, Index No. 101615/2009 (N.Y. Sup. Ct.)*[14]

Jay Wexler ("Wexler") alleges that he was an investor in Rye Select Broad Market Prime Fund, L.P. (the "Rye Fund"), which invested in the Tremont Fund, a BLMIS customer.  On February 5, 2009, Wexler filed an action in the Supreme Court of the State of New York, New York County, both individually and derivatively on behalf of the Rye Fund, against the Madoff Defendants, Annette Bongiorno ("Bongiorno"), Frank DiPascali ("DiPascali") and certain other entities (the "Wexler Action").  The complaint alleges causes of action against the Madoff Defendants for fraud, aiding and abetting fraud, breach of fiduciary duty, professional negligence, negligent misrepresentation, conversion and unjust enrichment.  As to Ruth Madoff, this action was voluntarily dismissed without prejudice on August 17, 2009.

Lawrence Ryan ("Lawrence"), together with his wife Theresa Ryan ("Theresa"), created

---

[13] Opposition to the Trustee's Application for Enforcement of the Automatic Stay and Preliminary Injunction by the Retirement Program for Employees of the Town of Fairfield, the Retirement Program for Officers and Firemen of the Town of Fairfield and the Town of Fairfield [hereinafter, "Fairfield Mem."].

[14] *Wexler v. KPMG, LLP*, Index No. 101615/2009 (Sup. Ct. N.Y. Co.), has been consolidated for pretrial purposes under the same name and index number with *FLB Foundation, Ltd. v. Bernard L. Madoff Inv. Sec. LLC*, *Ryan v. Friehling & Horowitz, P.C.*, *Greenberg v. Friehling & Horowitz, P.C.*, and *McBride v. KPMG International*.  See Status Letter, p. 2.

the Ryan Trust, with Theresa as the trustee.  As of November 2008, Theresa, individually and

through the Ryan Trust, invested approximately $6.3 million with BLMIS.  Plaintiff Daniel Ryan

("Daniel"), Theresa's son, invested over $450,000 with BLMIS.  On February 5, 2009, Theresa

and Daniel, individually and on behalf of the Ryan Trust, commenced an action in the Supreme

Court of New York, New York County against the Madoff Defendants and others, including

DiPascali, Bongiorno and the BLMIS accounting firm Friehling & Horowitz, P.C.   They

amended their complaint on October 22, 2009 to add defendants and additional claims against

Andrew, Mark and Peter Madoff (the "Ryan Action").

Matthew Greenberg, Walter Greenberg, Doris Greenberg and the Estate of Leon

Greenberg, each of whom held investment accounts at BLMIS, commenced an action in the

Supreme Court of New York, County of New York against the Madoff Defendants and others,

including Friehling & Horowitz, P.C., DiPascali and Bongiorno (the "Greenberg Action").

Donna M. McBride alleges that she was a member of Beacon Associates LLC II (the

"Beacon Fund").  On October 22, 2009, McBride commenced her action in the Supreme Court of

New York, County of New York against, *inter alia*, the Madoff Defendants, both individually

and on behalf of the Beacon Fund (the "McBride Action").

The FLB Foundation, Ltd., ("FLB") which held a customer account with BLMIS,

commenced an action in the Supreme Court of New York, County of New York on February 18,

2009, and filed an amended complaint on August 11, 2009, against the Madoff Defendants and

others, including DiPascali, David Gary Friehling, Eli Bruce Horowitz, Madoff International and

Madoff, Ltd. (the "FLB Action").   In defense of the complaint, the relevant Madoff Defendants

filed motions to dismiss, in response to which FLB filed an affirmation in opposition.   The

motions to dismiss the FLB Action have been held in abeyance. *See* Sheehan Aff., Ex. VV.

Collectively, the Wexler, Ryan, Greenberg, McBride and FLB Actions allege claims for aiding and abetting fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, aiding and abetting fraud in the inducement, conversion, unjust enrichment, conspiracy to hinder, delay and defraud, false representation, wrongful appropriation of funds and negligence. *Id.*, Ex. BB [hereinafter, "Wexler Amended Compl."], ¶¶ 482-501, 506-516; Ex. EE [hereinafter, "Ryan Amended Compl."], ¶¶ 319-342, 377-387; Ex. FF [hereinafter, "Greenberg Compl."], ¶¶ 312-335; 368-378; Ex. Z [hereinafter, "McBride Compl."], ¶¶ 338-357, 366-384, 404-424; Ex. SS [hereinafter, "FLB Amended Compl."], ¶¶ 30-54. Specifically, they allege that the Madoff Defendants "had actual knowledge of . . . the [BLMIS] fraud based on their roles and responsibilities . . . and their knowledge of the indications of fraud," Wexler Amended Compl., ¶ 412, *see also* Ryan Amended Compl., ¶ 322, Greenberg Compl., ¶ 315, McBride Compl., ¶ 342, FLB Amended Compl., ¶¶ 26, 27, and that the Madoff Defendants misused BLMIS funds for personal expenses, including vacations, cars, and home purchases, Wexler Amended Compl., ¶ 300, Ryan Amended Compl., ¶ 227, Greenberg Compl., ¶ 224, McBride Compl., ¶ 241, FLB Amended Compl., ¶¶ 27, 54. The plaintiffs are seeking compensatory and punitive damages, disgorgement, restitution of all earnings, profits, compensation and benefits received by the defendants through their unlawful conduct, and attorneys' fees and costs.

On December 1, 2009, defendant JP Morgan Chase sought to stay the Wexler, Ryan, Greenberg and McBride Actions pending the resolution of its motion to dismiss in *MLSMK Investments Co. v. JP Morgan Chase & Co. and JP Morgan Bank, NA*, 09-CV-4049 (BSJ), which is currently pending before the United States District Court for the Southern District of New York. *Id.*, Exs. GG, HH, II. The New York Supreme Court stayed these actions in orders

dated January 25, 2010 and February 1, 2010.[15]  *Id.*, Exs. JJ, KK, LL.  In addition, the FLB

Action is currently stayed.  *Id.*, Ex. JJ.  In October 2010, however, Justice Lowe, who presides

over these consolidated cases in the state court, issued a Preliminary Conference Order, which

set forth a briefing schedule governing discovery and dispositive motions.  Pursuant to the Order,

which directed the state court plaintiffs to serve initial demands for discovery by January 10,

2011, initial demands have been served with responses due on February 24, 2011.  In December

2010, several defendants in these consolidated cases filed motions to dismiss.  Status Letter, p. 2.

The plaintiffs filed briefs in opposition to the various motions to dismiss at the end of January

2011.  Second Status Letter, p. 2.

## V.     Participation of Third Party Plaintiffs in the SIPA Liquidation of BLMIS

All of the Third Party Plaintiffs have availed themselves of the Court's Claims Procedure

Order.  Many of these claims have been allowed and fully or partially satisfied with an advance

from SIPC, in exchange for which the claimant executed an assignment and release.

Specifically, on January 21, 2009, Defendant Theresa Ryan filed four customer claims, two of

which have been allowed and fully satisfied.[16]  The other two claims have not yet been

determined by the Trustee.  Similarly, claims filed by the Lautenberg Foundation and Ellen

Lautenberg on March 2, 2009, and by Joshua S. Lautenberg on March 4, 2009, were partially

allowed and satisfied.  Matthew Greenberg filed two customer claims on January 23, 2009 and

February 2, 2009, one of which has been allowed and partially satisfied.  Walter Greenberg and

Doris Greenberg filed customer claims on February 6, 2009 and February 20, 2009, respectively,

---

[15] The Wexler Action was previously stayed upon the request of certain defendants on November 19, 2009 pending the outcome of motions to dismiss filed in the related action of *In re Tremont Securities Law, State Law & Insurance Litigation*, Case No. 08-CV-11117 (TPG) (S.D.N.Y.).  The relevant motions to dismiss were denied as moot on March 30, 2009, but the Wexler Action appears to have nevertheless remained stayed pursuant to the New York Supreme Court's January 25, 2010 and February 1, 2010 orders, as explained above.

[16] Theresa Ryan filed an objection on September 14, 2009 in response to the determination of one of these claims.

which were allowed and partially satisfied.  Also on February 20, 2009, Doris Greenberg filed an additional claim as the executor of the estate of Leon Greenberg, which was partially satisfied.

Certain of the Third Party Plaintiffs' claims have been denied by the Trustee on the basis that the claimants did not hold a customer account with BLMIS, but only invested with a feeder fund that, in turn, invested with BLMIS.  With respect to the Fairfield Action, the Retirement Programs filed a customer claim on March 2, 2009, which was denied.  They were investors in Maxam Fund, which has filed its own customer claim that has yet to be determined.  With respect to the Wexler Action, Wexler filed a customer claim in the SIPA proceeding on February 6, 2009, which was likewise denied.  He was an investor in the Rye Fund, which itself has filed two customer claims that have yet to be been determined.  McBride filed two claims in the SIPA proceeding on March 3, 2009, both of which were denied.  She was a member of the Beacon Fund, a subsidiary fund of Beacon Associates LLC, which filed a claim that has yet to be determined.  In addition, the Trustee denied a customer claim filed by Chavez on February 17, 2009, as he simply never held an account with BLMIS.

These determinations are subject to litigation currently pending before this Court on the Trustee's Motion for an Order to Affirm Trustee's Determinations Denying Claims of Claimants Without BLMIS Accounts in their Names, Namely, Investors in Feeder Funds.  (Dkt. No. 2416).  This issue in dispute is whether such "indirect investors" qualify as "customers" under SIPA section 78*lll*(2) entitled to distributions separate from those made to satisfy claims filed by their investment funds (the "Customer Issue").  This Court received over 150 written submissions filed in response to the Trustee's motion on this Customer Issue.

Finally, Defendants Stahl and Abend filed general creditor claims for deferred compensation and back pay on February 24, 2009 and May 22, 2009, respectively.  The Trustee

is currently investigating both claims. Daniel Ryan filed two customer claims on January 21, 2009 and June 29, 2009, neither of which has been determined. Last, with respect to the FLB Action, the claim filed by FLB on January 21, 2009 was denied on October 19, 2009, as the FLB customer account was overdrawn, or in a negative Net Equity position.

## **DISCUSSION**[17]

The Trustee seeks to enjoin the Third Party Plaintiffs, all of whom have availed themselves of this Court's jurisdiction, from proceeding with their actions against the Madoff Defendants. Not only do they parrot the Trustee's Madoff Complaints almost word-for-word, but they also seek the same funds from the Madoff Defendants that they should be seeking—and are currently seeking—from the BLMIS estate. Each of the Third Party Plaintiffs purports to be a customer or other creditor of BLMIS, or a so-called BLMIS feeder fund, and the relationships between the Third Party Plaintiffs and the Madoff Defendants are based entirely on each plaintiff's status as such. While titled differently, the Third Party Plaintiffs' claims all arise from the Madoff Defendants' alleged involvement in Madoff's Ponzi scheme and the collapse of BLMIS, and are properly being addressed by the Trustee in this Court. There is simply no basis for certain customers, much less employees or investors in customers, to receive more than their fair share over those who have not yet recovered their investment by suing the Madoff Defendants for fictitious profits and other damages, with no independent basis for their claims. The Third Party Plaintiffs cannot convincingly contend that their causes of action, no matter what form they take, are independent of their claims against the BLMIS estate, and they are therefore bound by the automatic stay.

---

[17] The law cited herein mirrors this Court's recent decision in *Picard v. Fox (In re Bernard L. Madoff Inv. Sec. LLC)*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010), but has been applied to the facts presented in connection with the Motion.

## I.   The Third Party Plaintiffs Have Submitted Themselves to This Court's Jurisdiction

As a threshold matter, the Third Party Plaintiffs have submitted themselves to the jurisdiction of this Court over the subject of their claims in the Third Party Actions, as they have filed claims with the Trustee in this SIPA liquidation seeking the same relief.[18]  It is well settled that by filing a proof of claim, a creditor submits to the bankruptcy court's equitable jurisdiction regarding adjudication of matters related to that claim, including avoidance actions.  *See, e.g.*, *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990); *Buena Vista Television v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 307 B.R. 404, 418 (Bankr. S.D.N.Y. 2004) ("[W]hen [plaintiffs] filed proofs of claim in the bankruptcy court, they submitted to the equitable jurisdiction of this court, especially with respect to the very subject matter of their claims.").  A customer claim filed in a SIPA action is equivalent to a proof of claim filed in a typical bankruptcy proceeding for purposes of submission to jurisdiction.  *Keller v. Blinder (In re Blinder Robinson & Co., Inc.)*, 135 B.R. 892, 896–97 (D. Col. 1991).

Moreover, in accordance with controlling Second Circuit precedence, this Court has "related to" jurisdiction over third party actions if they might have "any conceivable effect" on the estate.  *See, e.g.*, *Publicker Indus. Inc. v. United States of America* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir. 1992); *In re Adelphia Commc'ns Corp.*, 2006 WL 1529357, at \*4; *Lyondell Chem. Co. v. CenterPoint Energy Gas Servs., Inc.* (*In re Lyondell Chem. Co.*), 402 B.R. 571, 586-87 (Bankr. S.D.N.Y. 2009); *In re Dreier LLP*, 429 B.R. 112, 131 (Bankr. S.D.N.Y. 2010) ("Related to jurisdiction to enjoin a third party dispute exists where the subject of the third party dispute is property of the estate, or the dispute would have an effect on the estate.") (internal quotations omitted).  As discussed *infra* at section IV, the effect of the Third

---

[18] Although the Town of Fairfield did not file a proof of claim, the Trustee represents that its claim is derivative of that of the Retirement Programs.  *See* Trustee's Compl., ¶ 89, n.4 (Dkt. No. 1).

Party Actions on the BLMIS estate is more than merely conceivable as the Third Party Plaintiffs' claims would be satisfied from the finite pool of funds sought by the Trustee, threatening the Trustee's ability to recover large potential judgments at the expense of the BLMIS estate.

## II.    The Third Party Actions Violate the Automatic Stay Pursuant to Section 362(a) of the Code

The commencement of a SIPA liquidation operates as an automatic stay of, *inter alia*, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor," or "any act to obtain possession of . . . or to exercise control over property of the estate." 11 U.S.C. § 362(a)(1), (3); SIPA § 78fff(b) (applying chapter 3 of Title 11).  Property of the estate, in turn, includes "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), "wherever located and by whomever held," 11 U.S.C. § 541(a), including causes of action possessed by the debtor at the time of filing.  *Jackson v. Novak*, (*In re Jackson*), 593 F.3d 171, 176 (2d Cir. 2010).  The automatic stay is one of the most fundamental bankruptcy protections and applies broadly to "give[] the debtor a breathing spell" and to prevent creditors from "obtain[ing] payment of the[ir] claims in preference to and to the detriment of other creditors."  H.R. Rep. No. 595, 95th Cong. 1st Sess. (1977); S. Rep. No. 989, 95th Cong. 2d Sess. 49 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 1978, pp. 5835, 5963, 6010, 6296–97.  In this SIPA proceeding, the stay protects customers of BLMIS by fostering fair, uniform, and efficient distribution of customer property.[19]

---

[19] At the time of the filing of the Motion and responsive pleadings, the parties disputed whether funds transferred from BLMIS prepetition constituted "customer property" recoverable by the Trustee under SIPA section 78fff-2(c)(3) and therefore subject to the automatic stay.  However, in *Picard v. Merkin, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 243, 271 *20-22 (Bankr. S.D.N.Y. Nov. 17, 2010), this Court has since held that transferred property becomes "customer property" only following a successful avoidance action.  This issue is currently on appeal before the District Court.  However, for purposes of this Motion, the record overwhelmingly supports granting preliminary injunctive relief based on stay violations and the Third Party Plaintiffs' intrusion into this Court's administration of the BLMIS liquidation, as explained more fully herein.

The Third Party Plaintiffs violated the stay by usurping causes of action belonging to the estate under sections 362(a)(3) and 541 of the Code.  The Trustee has "exclusive standing" to assert causes of action belonging to the estate; "conversely, if the cause of action belongs solely to the shareholders or creditors, the trustee has no standing to assert it."  *McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008) (quoting *Goldin v. Primavera Familienstiftung, Tag Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 324–25 (Bankr. S.D.N.Y. 1996)).  The Second Circuit has held that "[i]f a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."  *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989); *see also The 1031 Tax Group*, 397 B.R. at 679 ("To determine standing, the Court must look to the underlying wrongs as pleaded in the complaint and whether the plaintiff alleges a particularized injury.").  In order to assert such a claim independently of the administration of the bankruptcy case, a creditor must have suffered an injury "significantly different" from the injuries to creditors in general.  *In re Sage Enter., Inc.*, No. 04-B-05548, 2006 WL 1722582, at *15 (Bankr. N.D. Ill. Apr. 28, 2006) (quoting *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989)) ("[W]here the creditors' injury, while having some personal elements, overlaps with injury suffered by other creditors . . . the question to be answered is whether the injury to the creditor is 'significantly different' from the injuries to other creditors in general.").  Conversely, "if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate."  *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th

Cir. 1994) (citations omitted).   A trustee's exclusive ability to bring causes of action that generally affect all creditors fosters the goals of the automatic stay by promoting orderly resolution of claims and preventing single creditors from achieving preferential recoveries.

The Third Party Plaintiffs are not seeking to redress a particularized injury or alleging harm caused directly to them by the Madoff Defendants.   Rather, the Third Party Actions assert violations of duties owed derivatively to all customers and creditors by virtue of the Madoff Defendants' positions generally at BLMIS, the breach of which resulted in losses to all Madoff victims.   Typical of the Third Party Actions are allegations that the Madoff Defendants owed a "duty to protect *the clients of BMIS* against policies and procedures that would result in misappropriation of *investor's [sic] monies*," "owed fiduciary duties of loyalty and reasonable care *to BMIS investors such as Plaintiffs*," "treat[ed] *investor monies* as a personal family bank account," "had an incentive to entice *people like Plaintiffs* to continue to invest," and "wrongfully appropriated *the plaintiff's funds and [sic] of others who deposited funds*," resulting in loss of their investments into BLMIS.   Wexler Amended Compl., ¶ 3; Ryan Amended Compl., ¶¶ 208, 210, 213, 270; Greenberg Compl., ¶ 331; FLB Amended Compl., ¶ 41; Fairfield Amended Compl., ¶¶ 51–52, 55, 60, 74, 90.   To the extent that misrepresentations are alleged, they were not made directly and solely to the Third Party Plaintiffs and therefore failed to result in any separate and particularized harm.   *See, e.g.*, Abend Compl., ¶ 7 ("[T]he Madoff Sons made false statements to plaintiff (*and other employees*) and failed to disclose Madoff Securities' criminal actions in order to induce plaintiff (*and others*) to continue to earn legitimate profits.") (emphasis added); Stahl Compl., ¶ 7 (same).   Indeed, in the preliminary stages of the Fairfield Action, for example, the Connecticut Superior Court granted a motion to dismiss the first complaint on the bases that, *inter alia*, there was "no allegation that the [Fairfield Plaintiffs] ever

24

dealt directly with Madoff or any co-defendant family members, or BLMIS itself," but only with

the feeder funds in which they invested, and "as to the claims against . . . Peter Madoff, Andrew

Madoff and Mark Madoff, the harms claimed by the plaintiffs in those counts are indirect,

remote and derivative with respect to those defendants' conduct." [20] *Fairfield Motion to Dismiss*

*Decision*, pp. 3, 28. As the Third Party Plaintiffs' claims seek to redress only that harm suffered

derivatively by all claimants and creditors of BLMIS, "the trustee is the proper person to assert

the claim[s], and the creditors are bound by the outcome of the trustee's action." *St. Paul Fire*,

884 F.2d at 701.

Contrary to the arguments of Stahl and Abend, their claims are not meaningfully different

such that they are exempt from the automatic stay. While the specific harm alleged—loss of

deferred compensation and back pay—is arguably not derivative of a harm suffered by the debtor

such that the debtor owned these causes of action prepetition, the claims are essentially

"proceeding[s] against the debtor" that are likewise stayed under section 362(a)(1) of the Code.

Stahl and Abend seek to end-run the automatic stay, which prevents them from suing BLMIS

directly, by asserting actions against Mark and Andrew Madoff as "employers" standing in the

shoes of BLMIS in their roles as supervisors at BLMIS. *See e.g.*, Abend Compl., ¶¶ 2, 4, 43;

---

[20] Relying on *Highland Capital Mgmt. LP v. Chesapeake Energy Corp.* (*In re Seven Seas Petroleum, Inc.*), 522 F.3d 575 (5th Cir. 2008), the Fairfield Plaintiffs argue unconvincingly that their claims against Peter Madoff for civil conspiracy, aiding and abetting and theft were directed at the Fairfield Plaintiffs and therefore do not belong to the Trustee. Unlike in *Seven Seas*, however, where a creditor allegedly made misrepresentations "to induce the bondholders to purchase" the notes, which they in reliance did, the Fairfield Plaintiffs' feeder funds, not the Madoff Defendants, were in privity with the Fairfield Plaintiffs. *Id.* at 586. The Fairfield Plaintiffs in fact concede that the Feeder Fund Defendants, rather than the Madoff Defendants, directed their actions against the Fairfield Plaintiffs by allegedly making fraudulent misrepresentations. *See, e.g.*, Fairfield Amended Compl., ¶ 41; Fairfield Mem. p. 13 ("Fairfield Plaintiffs were fraudulently *induced by the Feeder Fund Defendants* to invest substantial sums of money with them for ultimate investment in the fraudulent and illegal Ponzi scheme run by Madoff and Peter Madoff.") (emphasis added). Moreover, the injuries alleged, as well as the purported original source of those injuries, are common to BLMIS and all of its customers and creditors. Finally, under the legal analysis in *Seven Seas*, even if the Fairfield Plaintiffs' claims asserted direct injuries, they would nonetheless belong to the Trustee. *Id.* at 589 ("[S]ome claims that . . . may be said to 'belong to' the creditors . . . are nonetheless vested exclusively in the trustee . . . because they ultimately seek to recover assets of the estate that are not under the debtor's control-by reason of a fraudulent transfer . . . ."). For all of the foregoing reasons, *Seven Seas* does not support the Fairfield Plaintiffs' position.

Stahl Compl., ¶¶ 2, 4, 44; *Bihari v. DDJ Capital Mgmt. LLC*, 306 B.R. 336, 338 (E.D. Cal. 2004) (holding that action against debtor's shareholders, officers and directors for overtime compensation violated the automatic stay because debtor would "necessarily be a major participant" in the action). For example, the alleged misrepresentations by Mark and Andrew Madoff that the IA business was legitimate were the exact same misrepresentations made by their father generally, a co-debtor along with BLMIS in this SIPA liquidation. *See* Stahl Complaint, ¶¶ 7, 22-24, Abend Complaint, ¶¶ 7, 21-23 (alleging, in essence, that Mark and Andrew knew or should have known about their father's Ponzi scheme, and never told BLMIS employees about it or misrepresented the legitimacy of the IA business to BLMIS employees in order to "perpetuate their father's lawless conduct" and induce the employees to continue to work for the "legitimate" arm of BLMIS). In fact, Stahl and Abend are currently seeking the exact dollar amounts from Andrew and Mark Madoff that they have already sought, and should be seeking, from BLMIS through their creditor claims filed with the Trustee. Such general creditor claims were properly filed with the Trustee by 39 other similarly situated employees of BLMIS, all but one seeking deferred compensation. Affidavit of Matthew Cohen in Support of Trustee's Application for Enforcement of Automatic Stay and Preliminary Injunction (Dkt. No. 3), ¶ 3. Only this Court has jurisdiction to adjudicate Stahl's and Abend's claims, as they have voluntarily filed them in this SIPA liquidation. Stahl's and Abend's attempts to supplement their creditor claims with suits against Andrew and Mark Madoff in the same amounts for the same injury, which was suffered by all employees generally, would potentially result in preferential and double recoveries, and are precluded by the automatic stay.

To the extent that certain causes of action set forth by the Third Party Plaintiffs in their complaints differ in name from those alleged in the Trustee's Madoff Complaint, those

distinctions are irrelevant.[21]   Whether sounding in bankruptcy, state law or common law, and

whether purporting to recover fraudulent transfers or tort damages, the Third Party Actions seek

to recover potential estate assets to redress harms common to all victims of Madoff's massive

Ponzi scheme that, consistent with the purposes of the automatic stay, belong exclusively to the

Trustee.   The Trustee has already commenced such actions against the Madoff Defendants

consistent with his duties to recover BLMIS funds lost as a result of the same wrongful conduct

alleged in the Third Party Actions.   *See* Ruth Madoff Complaint, ¶¶ 5, 16, 22; Madoff Family

Complaint, ¶¶ 1, 4, 5.   Like the Trustee, the Third Party Plaintiffs allege that the Madoff

Defendants ignored obvious red flags and, based on their supervisory roles at BLMIS, knew or

should have known of the fraud.   *See* Lautenberg Compl., ¶¶ 31-34, 38 (alleging that Peter

Madoff ignored "red flags"); Fairfield Compl., 1st Count, ¶¶ 73-74 (alleging willful blindness by

Peter Madoff); Wexler Amended Compl., ¶ 412 (alleging that the named Madoff defendants

"had actual knowledge of . . . the [BLMIS] fraud based on their roles and responsibilities at

BMIS and MSIL and their knowledge of the indications of fraud . . . ."); *see also* Ryan Amended

Compl., ¶ 322, Greenberg Compl., ¶ 315, McBride Compl., ¶ 342.   Therefore, allowing the Third

Party Plaintiffs to proceed against the Madoff Defendants for their own independent recoveries

on these grounds would "convert the bankruptcy proceeding into a race to the courthouse," and

effectively "derail the bankruptcy proceedings."   *Fisher v. Apostolou*, 155 F.3d 876, 883 (7th

Cir. 1998).

Accordingly, as the claims asserted in the Third Party Actions violate the automatic stay,

they are void *ab initio* with respect to the Madoff Defendants.   *FDIC v. Hirsch (In re Colonial

Realty Co.)*, 980 F.2d 125, 137 (2d Cir. 1992) ("[A]ctions taken in violation of the stay are void

---

[21] For example, the Fairfield Plaintiffs argue that their claims do not belong to the Trustee because they do not seek
fraudulent transfers originating from BLMIS, like the Trustee, but merely seek "damages" from independent torts
committed by the Madoff Defendants. *See* Fairfield Mem., pp. 18–20.

and without effect.") (citing *48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987)); *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994).

### III. The Third Party Actions Violate At Least One Stay Order of the District Court (Stanton, D.J.)

In addition to violating the automatic stay, the Third Party Actions violate at least one stay order of the District Court in connection with the related, ongoing SEC litigation, as the Third Party Plaintiffs are interfering with potential estate assets. All parties herein received notice of, and are bound by, the District Court's order entered December 15, 2008 (the "December 15, 2008 Stay Order") declaring that "all persons and entities are stayed, enjoined and restrained from directly or indirectly . . . interfering with any assets or property owned, controlled or in the possession of [BLMIS]." *SEC v. Bernard L. Madoff*, 08-CIV-10791 (LLS), Dkt. No. 4, ¶ IV (reinforcing the automatic stay); *see also* Order On Consent Imposing Preliminary Injunction Freezing Assets and Granting Other Relief Against Defendants, Dec. 18, 2008, Dkt. No. 8, ¶ IX (the "December 18, 2008 Stay Order") ("[N]o creditor or claimant against [BLMIS], or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the control, possession, or management of the assets subject to the receivership."); Partial Judgment on Consent Imposing Permanent Injunction and Continuing Other Relief, Feb. 9, 2009, Dkt. No. 18, ¶ IV (incorporating and making permanent the December 18, 2008 Stay Order) (the "February 9, 2009 Stay Order," and together with the December 15, 2008 and December 18, 2008 Stay Orders, the "District Court Stay Orders"). Accordingly, the Third Party Actions not only violate the automatic stay, but also directly contravene at least the December 15, 2008 Stay Order.[22]

---

[22] Certain Third Party Plaintiffs argue that the extant stays do not apply to their causes of action because the Trustee,

**IV.     The Third Party Actions are Preliminarily Enjoined Pursuant to Section 105(a) of the Code**

Section 105(a) of the Code permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]."  11 U.S.C. § 105(a). Section 105(a) is not limitless, and thus "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law."  *Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 96 (2d Cir. 2010) (internal quotations and citations omitted).  However, bankruptcy courts are empowered to utilize their equitable powers under section 105(a) where appropriate "to facilitate the implementation of other Bankruptcy Code provisions."  *Id.* at 97 (quoting *Bessette v. Avco Fin. Servs. Inc.*, 230 F.3d 439, 444 (1st Cir. 2000)).

**a.     Threat to the BLMIS Estate Warrants Extension of Section 362(a) of the Code**

To the extent section 362(a) and the District Court Stay Orders do not apply in their own right to stay the Third Party Actions, the damaging effects of the Third Party Actions on the estate warrant extending the stay pursuant to section 105(a) of the Code and well-settled Second Circuit precedent.  While section 362(a)(1) of the Code typically stays "proceeding[s] against the debtor," courts have consistently utilized section 105(a) to extend section 362 to third-party actions against non-debtor entities "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate."  *Queenie, Ltd. v. NyGard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003); *see also Nevada Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365

---

who is not a plaintiff here, would hypothetically lack standing to assert them under the *Wagoner* rule.  Such argument is irrelevant. *See generally Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991). Whether the Trustee is *in pari delicto* with the Debtor and therefore lacks standing under *Wagoner* would be appropriate for this Court's review only upon an appropriate objection to the Trustee's attempt to assert such claims himself, and only in the confines of that action. *Id.* (holding that the chapter 11 trustee lacked standing to assert claims belonging to the estate where he was the plaintiff in the adversary proceeding before the court); *see also Picard v. Fox (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 10-03114, Slip. Op. at 6 (Bankr. S.D.N.Y. Aug. 3, 2010) (Dkt. No. 49).

B.R. 401, 409 n.20 (S.D.N.Y. 2007) ("Courts consistently have found that section 105(a) may be used to stay actions against non-debtors even where section 362 otherwise would not provide such relief . . . ."); *Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998) ("The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include suits . . . which may affect the amount of property in the bankrupt estate, or the allocation of property among creditors.") (internal quotations and citations omitted).

The Madoff Defendants are precisely the non-debtors against whom third-party actions "will have an immediate adverse economic consequence for the debtor's estate." *Queenie*, 321 F.3d at 287.    The particular defendants targeted by the Third Party Actions are close Madoff family members, key BLMIS employees, and thus central to the Trustee's investigation.    The Trustee seeks to recover over $244 million from the Madoff Defendants through his pending adversary proceedings and asserts that, based on his investigation to date, "all assets held by the Madoff Defendants are related to BLMIS customer property."[23]    *See* Memorandum of Law in Support of Trustee's Application for Enforcement of Automatic Stay and Preliminary Injunction [hereinafter, "Trustee's Mem. Law"], p. 9.    Andrew, Mark and Shana Madoff worked at BLMIS for the entirety of their professional lives, Peter Madoff worked at BLMIS since 1965, and none of the Madoff Defendants has any apparent income other than that derived from BLMIS and related entities.    *See id.*    Therefore, any judgment in favor of the Third Party Plaintiffs would be

---

[23] Many Third Party Plaintiffs argue that the Madoff Defendants have assets other than proceeds of fraudulent transfers from BLMIS to satisfy a potential judgment, ranging from the profitable market making and proprietary trading units of BLMIS that were allegedly "sold . . . for $25 million in the course of the liquidation," to an increase in the value of assets purchased with tainted funds, to funds from BLMIS before the Ponzi scheme commenced. Memorandum of Law in Opposition to the Trustee's Application for Enforcement of the Automatic Stay and Preliminary Injunction by the Lautenberg Foundation, Joshua S. Lautenberg and Ellen Lautenberg (Dkt. No. 15), pp. 19, 25–27; Opposition to Trustee's Application for Enforcement of Automatic Stay and Preliminary Injunction (Dkt. No. 14), pp. 7-8; Fairfield Mem., p. 21; Memorandum of Law of Reed Abend and Richard I. Stahl in Opposition to the Trustee's Application for Enforcement of Automatic Stay and Preliminary Injunction (Dkt. No. 16), pp. 13–14. However, the Trustee's investigation has revealed that the market making and proprietary trading businesses appear to have been propped up by the fraudulent IA business since at least 2002, and that any income received by the Madoff Defendants unrelated to fraudulent proceeds from BLMIS is *de minimis*.  *See* Trustee's Mem. Law, pp. 3, 8 n.10, 9 n.11.

satisfied from the same limited pool of funds sought by the Trustee, threatening the Trustee's ability to collect on large potential judgments to the detriment of the BLMIS estate.

The Seventh Circuit's decision in *Fisher*, relying on Second Circuit precedent to uphold the bankruptcy court's extension of the automatic stay under section 105(a), is particularly instructive here. *See Fisher*, 155 F.3d at 878 ("[F]ollowing, by and large, the reasoning of the Second Circuit in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), we believe that the investors' claims . . . should be stayed pursuant to § 105 . . . ."). In *Fisher*, the chapter 7 debtors were Thomas W. Collins ("Collins") and Lake States, the corporation he used to run a fraudulent scam "similar to a Ponzi scheme." *Id.* at 877–78. During the bankruptcy, several creditor-investors (the "Apostolou Plaintiffs") asserted separate District Court fraud actions against Collins's non-debtor accomplices. The court found that the Apostolou Plaintiffs' claims aimed at, while not property of the estate, "the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, [and] as part of the same conspiracy." *Id.* at 882. As a result, the court found that the fraud claims might "affect the amount of property in the bankrupt estate, or the allocation of property among creditors," and were thus properly stayed. *Id.* at 882. Accordingly, the court found, "the Apostolou Plaintiffs must wait their turn behind the trustee, who has the responsibility to recover assets for the estate on behalf of the creditors as a whole." *Id.* at 881.

As in *Fisher*, the Third Party Actions will likely negatively affect the amount of property in the estate and the allocation thereof to customers and creditors, justifying an extension of the automatic stay. The Trustee's Madoff Complaints and the Third Party Actions target "the same limited pool of money, in the possession of the same defendants, as a result of the same acts, performed by the same individuals, as part of the same conspiracy." *Id.* at 882. Indeed, the

Trustee and the Fairfield Plaintiffs, for instance, have one common goal: "to recover the multi-million dollar losses the Town's retirement plans have sustained as a result of defendants' wrongful participation in the notorious fraudulent investment scheme perpetrated by [Madoff]." Fairfield Compl., p. 1.  Likewise, the Lautenbergs target Peter Madoff to recover what they have lost in the Ponzi scheme, as do the Chavez, Wexler, Ryan, Greenberg, McBride and FLB Plaintiffs with respect to other Madoff Defendants.  *See* Lautenberg Compl., pp 22-23; Chavez Compl., pp. 5, 7; Wexler Amended Compl., pp. 261-63; Ryan Amended Compl., pp. 191-92; Greenberg Compl., pp. 189-90; McBride Compl., pp. 215-17; FLB Amended Compl., p. 11. Stahl and Abend similarly seek funds that they were denied as a result of the fraud—the same amounts listed in their proofs of claim before this Court.  Stahl Compl., p. 9; Abend Compl., pp. 8-9.  The allegations in the Third Party Actions are not only similar to, but in some instances apparently derived from, the Trustee's pending Madoff Complaints.  Indeed, for instance, only after the Trustee alleged that the Madoff Defendants "took huge sums of money out of BLMIS to fund personal business ventures and personal expenses such as homes, cars, and boats" did the Ryan and Wexler plaintiffs amend their complaints to include similar allegations.  Madoff Family Complaint, ¶ 3; Trustee's Mem. Law, p. 27.  While the Trustee endeavors to have this pool of funds returned to the BLMIS estate for *pro rata* allocation among all Madoff victims, the Third Party Actions seek to divert the funds for themselves and discrete classes of investors and creditors in direct contravention of the SIPA distribution scheme.  The proper beneficiaries of any claims asserted against the Madoff Defendants arising from their alleged involvement in the scheme are the customers and creditors of the SIPA liquidation estate, and the proper party to assert such claims is therefore the Trustee.

**b. Continuation of the Third Party Actions Threatens the Court's Jurisdiction and Interferes with the Administration of the Case, Warranting an Injunction under Section 105(a)**

A substantial threat to this Court's jurisdiction likewise warrants the issuance of a preliminary injunction pursuant to section 105(a) of the Code. Because injunctions under section 105(a) are authorized by statute, they need not comply with traditional requirements of Rule 65.[24] *McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs, Inc.)*, 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990); *Garrity v. Leffler (In re Neuman)*, 71 B.R. 567, 571 (S.D.N.Y. 1987). Rather, a bankruptcy court may utilize section 105(a) of the Code to "enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it." *Johns-Manville Corp. v. Colorado Ins. Guar. Assoc. (In re Johns-Manville Corp.)*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988) (quoting *LTV Steel Co., Inc. v. Board of Ed. of the Cleveland City Sch. Dist. (In re Chateaugay Corp.)*, 93 B.R. 26, 29 (S.D.N.Y. 1988)); *see also Malm v. Goldin*, No. 92-CIV-8012 (LJF), 1993 WL 330489, at *2 (S.D.N.Y. Aug. 27, 1993); *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 849 (Bankr. S.D.N.Y. 1994); *AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.)*, 117 B.R. 789, 802 (Bankr. S.D.N.Y. 1990).

---

[24] The traditional requirements for a preliminary injunction under Rule 65 are, however, also satisfied here. Under Rule 65, the moving party must show (1) that it will suffer irreparable harm in the absence of the relief requested; and (2) that there is either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of the hardships tipping in favor of the moving party. *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002). As demonstrated herein, there is a substantial "likelihood of success on the merits" of the Trustee's claims for relief on the bases that the Third Party Actions violate the automatic stay and interfere with the administration of the estate. The Third Party Actions threaten irreparable harm to the estate by seeking potentially preferential and double recoveries from the same limited pool targeted by the Trustee in his avoidance actions. Additionally, the Actions impair this Court's jurisdiction, as explained below. *See Calpine Corp. v. Nevada Power Co. (In re Calpine Corp.)*, 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006) (finding case law in this district has established a limited exception to the irreparable harm requirement where the action to be enjoined is one that would impair the court's jurisdiction). Last, the balance of harms tips decidedly in favor of enforcing the stay; if the Third Party Actions are successful, the limited pool of funds that the Trustee seeks on behalf of customers will unjustly be redeemed by a finite number of BLMIS customers and creditors, to the detriment of all other deserving Madoff customers and creditors.

As the Court presiding over the SIPA liquidation of BLMIS, this Court has sole jurisdiction over the administration and distribution of estate assets to customers and creditors. *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) ("Bankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate.") (citing 28 U.S.C. § 1334(e)); *see also* 78 U.S.C. § 78eee(b)(2)(A)(i), (4) ("Upon the filing of an application with a court for a protective decree . . . such court shall have exclusive jurisdiction of such debtor and its property wherever located . . . .").  The Third Party Plaintiffs' duplicative actions threaten to substantially undermine this Court's jurisdiction, as further prosecution could ultimately result in another court's determining how potential estate funds are distributed among certain BLMIS customers and creditors.  To the extent that the Third Party Plaintiffs invested less than they redeemed, for example, any recovery achieved through their Third Party Actions would exceed their entitlement to BLMIS distribution under SIPA and this Court's Net Equity Decision.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 135, 140 (Bankr. S.D.N.Y. 2010) (holding that customers' Net Equity claims, and thus their *pro rata* shares of customer property, are determined by reference to their net investments in BLMIS).  As oral argument on the appeal of the Net Equity Decision has been scheduled for March 3, 2011 before the United States Court of Appeals for the Second Circuit, the Third Party Actions are a disfavored form of litigation strategy that could result in multiple courts arriving at different and inconsistent rulings.  *See AP Industries, Inc.*, 117 B.R. at 802 ("[T]he possibility of inconsistent judgments warrants the issuance of an injunction enjoining Defendants from further prosecution of the New York Actions.").  Accordingly, the threat posed by the Third Party Plaintiffs to this Court's jurisdiction, particularly over the claims they voluntarily filed before this Court, provides additional grounds for preliminary injunctive relief under section 105(a) of the Code.

Finally, the Third Party Actions have already begun interfering with the efficient administration of the estate by placing burdensome procedural and discovery demands upon the Trustee in connection with the Third Party Actions at the expense of the Trustee's obligations to the BLMIS estate. Stahl alone has sought from the Trustee "[a]ll communications sent by the Madoff Sons"; "[a]ll documents and communications relating or referring to the legality of BMIS"; "[a]ll documents and communications relating or referring to the role(s) of the Madoff Sons in the London office of BMIS"; and "[a]ll documents provided by the Madoff Sons to SIPC." Sheehan Affidavit, Ex. O, Nos. 2, 6, 15, 18. The notion that third party claimants' lawsuits should be driving the discovery on Andrew and Mark Madoff's alleged complicity in the Ponzi scheme—ahead of the Trustee's discovery—speaks volumes of the impropriety of these actions at this time. Deadlines for these and other discovery demands are quickly approaching in various jurisdictions and will continue to seriously impair the Trustee's abilities to execute his own discovery on behalf of all Madoff victims unless the Third Party Plaintiffs are preliminarily enjoined.

## CONCLUSION

As set forth herein and at oral argument, the Third Party Actions as against the Madoff Defendants are directly violative of the extant stays, specifically the automatic stay under section 362(a) and at least one of the District Court Stay Orders, and are therefore void *ab initio* as against these defendants. Additionally, the Third Party Plaintiffs are to be preliminarily enjoined under section 105(a) of the Code from proceeding with the Third Party Actions, or any related action, against the Madoff Defendants, pending final dispositive orders of this Court in the Trustee's Madoff Actions.

The Trustee is directed to submit an order consistent with this memorandum decision.


<u>Dated</u>: New York, New York
        February 9, 2011

                                        /s/ Burton R. Lifland
                                        United States Bankruptcy Judge

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff, | Adv. Pro. No. 08-01789 (BRL) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-03268 |
| v. | |
| RICHARD I. STAHL; REED ABEND; THE LAUTENBERG FOUNDATION, JOSHUA S. LAUTENBERG, ELLEN LAUTENBERG; EMILIO CHAVEZ, JR.; RETIREMENT PROGRAM FOR EMPLOYEES OF THE TOWN OF FAIRFIELD, THE RETIREMENT PROGRAM FOR POLICE OFFICERS AND FIREMEN OF THE TOWN OF FAIRFIELD and THE TOWN OF FAIRFIELD; FLB FOUNDATION, LTD., JAY WEXLER, individually and derivatively on behalf of Rye Select Broad Market Prime Fund, L.P.; DANIEL RYAN and THERESA RYAN, individually and on behalf of the RYAN TRUST; MATTHEW GREENBERG, WALTER GREENBERG and DORIS GREENBERG, individually and on behalf of the Estate of Leon Greenberg; and DONNA MCBRIDE, individually and derivatively on behalf of Beacon Associates LLC II, | |
| Defendants. | |